**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **STAVROFF LAND &** | : | Case No. _____ |
| **DEVELOPMENT, INC.,** | : | |
| 6689 Dublin Center Drive | : | |
| Dublin, OH 43017, | : | JUDGE _____ |
| | : | |
| **DVC 10 ASSOCIATES, LLC,** | : | |
| 6689 Dublin Center Drive | : | MAGISTRATE JUDGE _____ |
| Dublin, OH 43017, | : | |
| | : | |
| **DVC 6525 ASSOCIATES, LLC,** | : | **Demand for Jury Trial** |
| 6689 Dublin Center Drive | : | |
| Dublin, OH 43017, | : | |
| | : | |
| **DVC 6561-6815 ASSOCIATES, LLC**, | : | |
| 6689 Dublin Center Drive | : | |
| Dublin, OH 43017, | : | |
| | : | |
| **DVC 6700 ASSOCIATES, LLC**, | : | |
| 6689 Dublin Center Drive | : | |
| Dublin, OH 43017, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **CITY OF DUBLIN, OHIO**, | : | |
| 555 Perimeter Drive | : | |
| Dublin, OH 43017, | : | |
| | : | |
| Defendant. | : | |

## **COMPLAINT**

Plaintiffs Stavroff Land & Development, Inc., DVC 10 Associates, LLC, DVC 6525
Associates, LLC, DVC 6561-6815 Associates, LLC, and DVC 6700 Associates, LLC (collectively
"Stavroff"), for their Complaint against Defendant City of Dublin, Ohio ("Dublin" or the "City")
aver and allege:

## I.   INTRODUCTION

1.      Private property rights are inviolate in Ohio.  Landowners are therefore entitled to a fair, impartial, transparent, and predictable zoning process when developing their private property. Historically, Dublin zoning mostly adhered to this familiar and legitimate process.  With that in mind, Stavroff purchased a large, failed commercial-retail property known as the Dublin Village Center ("DVC"), which was originally zoned under Dublin's Community Commercial District ("CCD").  Over a period of years, Stavroff revitalized the DVC.

2.      Subsequent to Stavroff's purchase of the DVC, Dublin abandoned its lawful approach to zoning and created the "Bridge Street District" (the "BSD" or "District").  The City took complete control over the use and development of private property within the BSD by adopting unlawful and overbearing development restrictions set forth in the City's Bridge Street District Developmental Code (the "BSD Code").  In doing so, the City unilaterally rezoned hundreds of acres of land and anointed its officials with unfettered and arbitrary discretion over private property within the District.  The BSD Code eviscerated landowners' protected private property rights, improperly relegating those rights to the subjective whims of City officials.  The City's subjective BSD Code restrictions have no place in lawful zoning.

3.      Virtually no proposed development could ever meet the vague, cumbersome, and overly complex requirements the City now imposes.  Worse, the BSD Code requirements foisted upon landowners are so onerous that it is economically infeasible to develop property without reliance upon variances and economic incentives from the City.  The City intentionally flipped its role from being the regulator of the reasonable use of land to the holder of the keys to the land's development.  No development can occur in the District unless the City ordains it.

4.      For example, the City welcomes developments by select local developers, including

two prominent residential developments near Stavroff's property. However, Stavroff's plans to redevelop the DVC have been uniformly rejected by the City.

5.      Stavroff first submitted a non-conforming plan alongside another well-known developer ("Application #1"), and the City approved the plan. When the other developer backed out, however, the City did too.

6.      Stavroff tried again. Stavroff invested significant sums to carefully and thoughtfully design a residential development that met the BSD Code's legitimate zoning requirements ("Application #2"). Despite this, the Planning and Zoning Commission ("PZC") rejected Application #2, holding Stavroff to standards that were not applied to similarly situated properties. The City arbitrarily blocked Stavroff's development without any legitimate basis.

7.      Stavroff tried a third time. After the City received Stavroff's last application ("Application #3"), the City adopted new amorphous "Interim Land Use Principles." Because it was clear that Application #3 fully complied with the BSD Code and would call for approval, the City improperly and retroactively applied the new Interim Land Use Principles to Stavroff's development and denied Application #3. One of the amorphous reasons cited for denial was that Stavroff's development was not "distinctly Dublin."

8.      The simple truth is that the City uses its BSD Code and Interim Land Use Principles to deny any development that City officials arbitrarily and subjectively find unworthy. Because Stavroff is not one of the City's select developers, its officials have improperly blocked the development of Stavroff's private property. The City has arbitrarily and capriciously singled Stavroff out, deprived Stavroff of any legitimate process, and prevented Stavroff from lawfully developing its property.

9.      Stavroff seeks to use its private property free from illegitimate restrictions and to

recoup the millions of dollars in damages, costs, and expenses it has incurred as a result of the City's misconduct and its unilateral imposition of its oppressive zoning scheme.  Stavroff therefore seeks injunctive, monetary, and declaratory relief for the City's egregious violations of the United States and Ohio Constitutions and Ohio zoning law.

## II.  PARTIES

10.    Plaintiff Stavroff Land & Development, Inc., is an Ohio corporation with its principal place of business in Dublin, Ohio.

11.    Plaintiffs DVC 10 Associates, LLC, DVC 6525 Associates, LLC, DVC 6561-6815 Associates, LLC, and DVC 6700 Associates, LLC are Ohio limited liability companies with principal places of business in Dublin, Ohio, are affiliates of Stavroff Land & Development, Inc., and are the owners of real property in Dublin known as the DVC, including Franklin County Parcel Nos. 273-009045, 273-009054, 273-009094, 273-009118, 273-009127, 273-009128, 273-009129, 273-009130, 273-009152, 273-009153, 273-009154, 273-009081, 273-013208 (the "Property").

12.    Defendant the City of Dublin, Ohio is a chartered municipal corporation located in Franklin County, Ohio and subject to the laws of the State of Ohio.

13.    In addition to the foregoing parties, the Attorney General of the State of Ohio is being served with a copy of this Complaint pursuant to Ohio Revised Code § 2721.12(A).

## III. JURISDICTION AND VENUE

14.    Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 2201, and 28 U.S.C. § 1367.  Jurisdiction supporting Stavroff's claim for attorneys' fees is conferred by 42 U.S.C. § 1988.

15.    Venue in this Court is proper under 28 U.S.C. § 1391(b)(2), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## IV. FACTS COMMON TO ALL CLAIMS

### A. Stavroff Purchases and Revitalizes a Failing Retail Center to the Benefit of the City and the Surrounding Area.

16.     The DVC is a 57.5-acre property on the west side of Sawmill Road south of Interstate 270 ("I-270"):



17.     Historically, the 36-year old shopping center, which was anchored by an AMC movie theater, thrived with retail tenants such as Michaels, BJ's Wholesale Club, Phar-Mor, Jo-Ann Fabrics, Applebee's, and DSW.

18.     Over time, the DVC began to struggle for a variety of reasons, such as a decrease in demand for brick-and-mortar retail stores, an antiquated retail design and lay-out, an oversupply of retail in Central Ohio, and a lack of visibility and accessibility from primary thoroughfares. By the early 2000s most of the original tenants had either filed for bankruptcy or moved to newer locations in the area that had superior visibility, access, and signage. By 2009, the DVC was in total disrepair, largely vacant, and abandoned by its absentee owner.

19.     In November 2009, Stavroff, a development company that specializes in complex real estate development and revitalization, purchased the DVC.

20.     At the time of the purchase, the DVC was zoned CCD. Stavroff accounted for this zoning while valuing the property for purchase. The existing zoning was a central quality of the property and integral to its value.

21.     After buying the DVC, Stavroff implemented emergency, hands-on management to stabilize the shopping center.

22.     Stavroff invested millions of dollars into the renovation of the AMC movie theater and surrounding buildings to revitalize the center, including the replacement of roofs, mechanical systems, parking lots, landscaping, and signage.

23.     Stavroff filled the DVC with both national and local tenants, such as Restoration Hardware Outlet, Covelli Enterprises, My Salon Suites, Big Sandy Superstore, Uniform Store, State Farm Insurance, Trading Places, Enterprise Rent-A-Car, First Federal Lakewood, Revelry Tavern, The Golf Room, Go-Yoga, Mannino's Grand Slam USA, and F45 Training.

24.     For many years, Stavroff's investments, efforts, and expertise have not only breathed new life into the DVC, but provided the Dublin community with a variety of new, safe, and family-friendly service and entertainment offerings.

**B.      The City Creates a Plan for the Development of the BSD.**

25.     In 2008, the City began a "vision process" to redevelop its Bridge Street Corridor – also referred to as the BSD.  The BSD is 1,100 acres south of I-270 on both the east and west of the Scioto River:



26.     In May 2009, the City hired Goody Clancy, a Boston-based firm, to work on the

BSD "visioning process."

27.    Goody Clancy began interviewing community stakeholders shortly thereafter.

28.    In addition, Goody Clancy brought carefully selected experts on emerging trends in commercial markets to the City for a speaker series.  These experts supported Goody Clancy's preferred style of development.  The speaker series began in October 2009, and lasted until December of that year, a month after Stavroff purchased the DVC.

29.    These experts forecasted significantly lower demand for traditional, auto-oriented suburban developments.  Instead, the experts opined that Americans increasingly wanted dense developments that offered a mixture of uses, were walkable, and mimicked a micro-urban environment.  The experts' conclusions indicated that Americans, and specifically the coming generation of millennials, wanted places to "live, work, and play."

30.    In June 2010, the City unveiled a series of five "Vision Principles" for the BSD.  The Vision Principles were purportedly established to guide development in the BSD in conjunction with other relevant planning documents in the evaluation of development applications.

31.    The five stated Vision Principles were to: (1) enhance economic vitality; (2) integrate the new center into community life; (3) embrace Dublin's natural setting and celebrate a commitment to environmental sustainability; (4) expand the range of choices available to Dublin and the region; and (5) create places that embody Dublin's commitment to community.  In its current condition and at this time, the DVC meets the Vision Principles.

32.    On October 25, 2010, Council formally adopted the Vision Principles through Resolution 50-10.  Stavroff remained skeptical of the Vision Principles.  As it articulated to the Columbus Dispatch in November 2010, the plan seemed "a little bit like Disneyland, a little bit like a fantasy land," sold to the City from people who are not part of the Dublin community.  Holly

Zachariah, *Vision of Dublin Gets Mixed Review*, COLUMBUS DISPATCH, Nov. 11, 2010. After articulating its opinion, Stavroff received threatening voicemails from two Council Members, who expressed frustration that Stavroff would publicly criticize the Vision Principles.

        **C.      The City Claims to Be Creating a Code That Makes Development Within the BSD Transparent, Predictable, and Efficient.**

33.      Beginning on January 31, 2011, the City hosted joint work sessions of Council, PZC, Architectural Review Board ("ARB"), and the Board of Zoning Appeals ("BZA") to discuss implementation strategies for the Vision Principles.

34.      At the April 14, 2011, joint work session, the City's consultants introduced concepts of a "form-based code," to regulate development in the BSD. At the session, the City released a first draft of the code.

35.      A "form-based code" is defined as:

> a means of regulating land development to achieve a specific urban form. Form-based codes foster predictable built results and a high-quality public realm by using physical form (rather than separation of uses) as the organizing principle, with less focus on land use, through municipal regulations. An FBC is a regulation, not a mere guideline, adopted into city, town, or county law and offers a powerful alternative to conventional zoning regulation.

Formed Based Code Institute "Form-Based Codes Defined," *available at* https://formbasedcodes.org/definition/.

36.      The City claimed that a form-based code would foster predictable and efficient approvals of developments within the BSD, which developers had claimed was lacking with the highly-negotiated, Planned Unit Developments ("PUD") process.

37.      The proposed form-based code became known as the BSD Code.

38.      The City claimed that if an applicant complied with the BSD Code, the application would be reviewed and approved by the Architectural Review Team ("ART") – an unelected team of representatives from various city departments that met monthly at city administrative offices.

The City also claimed that the application would be approved in a matter of months without need for PZC or Council approval.

39.     After a series of work sessions and public meetings throughout 2011, the PZC began its final review of the BSD Code and area rezoning map on January 5, 2012.

>    **D.     The PZC Recommends Approval of a Version of the BSD Code That Gives the City Unfettered Discretion Over Development within the BSD.**

40.     Stavroff is a critical stakeholder in the BSD.  Upon information and belief, Stavroff is currently the second largest private property owner in the BSD.  On January 20, 2012, Stavroff representatives met with City representatives concerning the proposed BSD Code.

41.     On February 2, 2012, the PZC recommended approval of the BSD Code and the rezoning of the BSD to Council.

42.     However, the version of the BSD Code that the PZC recommended to Council ultimately looked and functioned nothing like the form-based code previously sold to Stavroff and the public.

43.     Instead, the BSD Code was overly prescriptive and unnecessarily added expensive guidelines that cost hundreds of thousands (or in some cases, millions) of dollars, while still taking many months (or, in some cases, years) to obtain the necessary approvals, which are rarely obtained. This was far from the expedited and efficient process the City promised.

44.     The BSD Code mandates precisely where streets and buildings can be located on private property.  In effect, these directives permit only one type of development and eliminate many legitimate uses of property that are both permitted under the BSD and desired by the community.

45.     Because the BSD Code is so overbearing in its requirements, nearly every development requires numerous waivers of the BSD Code's development restrictions.  As a result,

instead of being reviewed by the ART, applications are reviewed by the PZC and then, in most cases, Council for ultimate approval.

46.     Even if an applicant could design a development that does not require waivers (i.e., the application perfectly complies with all of the BSD Code's exhaustive requirements) and thus, must be approved, the City still has ultimate control on whether an application has "effective" approval due to the extraordinarily expensive requirements, such as granite curbs, underground storm water, public vehicular and pedestrian roadway design and street network, parking garages, building materials, density limitations, and open spaces.  Adhering to these requirements is economically infeasible.  Applicants therefore need public financing to assist with the overbearing requirements of the BSD Code.  Accordingly, an application is effectively "approved" once public financing is secured, which only City Council can provide.

47.     As a result, as applied, the BSD Code requires: (1) Council to want a specific project on a landowner's private property; and (2) the landowner/developer must completely acquiesce to all of the City's manufactured conditions and desires.  Only then will the City agree to enter into an economic development agreement that allows for utilization of public financing instruments, like Tax Increment Financing ("TIF"), which provides a means to pay for the City's mandated public infrastructure.

48.     If Council does not want a project – or if they do not like the applicant – and the project complies with the BSD Code's requirements, Council still has the ability to block the project by refusing to enter into an economic development agreement.  This forces the landowner/developer into self-funding the prescribed public infrastructure improvements in order to proceed with their development.

49.     However, it is not economically feasible for any developer to self-fund the

-10-

extraordinary public infrastructure requirements mandated by the BSD Code.

50.     Essentially, because the BSD Code requires both a development plan that perfectly complies with extraordinarily onerous criteria and an economic development agreement, the City maintains complete control over the land.

**E.     Over Stavroff's Objections, the City Approves the BSD Code.**

51.     On February 16, 2012, Stavroff representatives again met with the City representatives regarding the BSD Code and proposed rezoning.

52.     During the February 16, 2012 meeting, City representatives stated that Council would soon adopt regulations for the BSD that would directly affect the development of the DVC by rezoning the Property and changing the zoning and building regulations applicable to it.

53.     The Stavroff representatives expressed concern that the proposed BSD Code would be economically infeasible for existing properties that had been improved, such as properties where developers had made significant investment in real property and infrastructure and had existing lease commitments and restrictive easements that preceded the adoption of the BSD Code. Stavroff also conveyed that the rezoning of its property to BSD would unfairly restrict and impede the redevelopment of the DVC, especially as compared to its existing zoning. Furthermore, it would negatively impact the value of the DVC as redevelopment would be too expensive without public subsidies and impractical due to existing conditions.

54.     The City ignored Stavroff's concerns.

55.     On March 23, 2012, Stavroff sent a letter to the City outlining its concerns with the recently recommended BSD Code. A true and accurate copy of the March 23, 2012 letter is attached hereto as **Exhibit 1**.

56.     As set forth in the letter, Stavroff stated that when Stavroff purchased the DVC, "it was, and is, our goal to redevelop the property into a vibrant, sustainable, mixed-use development."

-11-

Furthermore, the DVC's zoning at the time of purchase, CCD, was "generally flexible in allowing for a redevelopment of the property for a multitude of uses and building styles and types."  And "[i]n the event our proposed redevelopment plan didn't adhere to the Community Commercial zoning we knew we could opt for the ubiquitous Planned Unit Development (PUD) process. . . . [T]his process would allow for any type of proposed redevelopment to be introduced with no strings attached."  Stavroff proposed "common-sense" language that would provide flexibility to those property owners who had unique existing conditions but might want to redevelop their properties in the future.  The language was also proposed with the hopes of avoiding future disputes.  Stavroff even pled with the City to "get it right now while we still have time."

57.     Again, the City blatantly disregarded Stavroff's valid concerns.

58.     Over Stavroff's objections, Council approved the BSD Code on March 26, 2012. The BSD Code applies to over 1,100 acres of land, including the DVC.

59.     On April 9, 2012, Council unilaterally rezoned the 1,100 acres of land within the BSD, including the DVC, against the will of Stavroff.

**F.     Stavroff Attempts to Work with the City to Redevelop the DVC through Application #1, but the City Refuses.**

60.     Despite the BSD Code's inherent difficulties, Stavroff invested substantial resources into redeveloping the DVC.

61.     On January 9, 2013, Stavroff and another developer contacted the City regarding plans to redevelop the DVC as set forth in Application #1.  Application #1 included a newly renovated movie theater and approximately 100,000 square feet of new or redeveloped retail, office, and restaurant space to be developed by Stavroff.  Application #1 also included approximately 400 luxury apartments to be developed by the other developer.

62.     The PZC approved Application #1 in July 2013.   Stavroff planned to start

construction shortly thereafter.

63.     Without a private-public partnership, including financial assistance from the City, redevelopment in accordance with the BSD Code is not economically feasible. As a result, Stavroff attempted to negotiate an economic development agreement with the City that included public infrastructure improvements.

64.     The parties came to a conceptual agreement on Phase I of Application #1. The parties also exchanged drafts of a "Development and Tax Increment Financing Agreement" and an "Infrastructure Agreement" for the referenced project.

65.     During the process of negotiating the economic development agreement, the developer partnering with Stavroff decided to terminate its involvement in the project.

66.     Within days, the City unilaterally terminated negotiations with Stavroff and halted the DVC's redevelopment because, according to the City, the "project was not moving forward" and Stavroff did not have a "sufficiently defined common vision for the future of DVC." The City's stated reasons for terminating negotiations were false. The City actually terminated negotiations because Stavroff is not one of the City's select developers.

### G.      The City Amends the BSD Code to Give Council the Ability to Approve or Deny Development at Council's Whim.

67.     On December 8, 2014, Council passed Ordinance No. 114-14, which gave Council exclusive control over development decisions within the BSD.

68.     Before Ordinance No. 114-14, Council's only role in the review process for development plan applications in the BSD was confined to a limited review for specific fiscal issues and as an appellate forum (i.e., Council made no determinations unless the applicant appealed an adverse decision).

69.      With the adoption of the Ordinance No. 114-14, Council changed the rules so that

it was the *only* decision maker in reviewing the initial Basic Plan (a/k/a Concept Plan) applications containing development agreements. Because nearly all Concept Plan applications contain development agreements, Council gave itself ultimate control over most development in the BSD. In the words of former Chairperson Groomes of the PZC, who is the current Mayor and a current City Council Member, "when looking at the Bridge Street District, every application has some sort of development agreement" and it "gives City Council latitude to keep virtually every application that comes in the door."

70. In short, with this new change, Council gave itself the latitude to control which developments are able to proceed regardless of whether a particular development reflects a legitimate use of private property.

71. This transparent power grab caused four of the seven PZC members, including now City Council Members Chris Groomes and Amy Kramb, to resign on December 11, 2014, as described in their public letter.[1]

72. Today, the BSD Code has a four-step development process.

73. The first step is optional. The BSD Code permits a developer to submit an application for an Informal Review, which allows the developer to receive feedback from the PZC with nominal investment of time and money before any formal action is taken. Although optional, the City's professional staff ("Staff") encourages developers to adhere to this step.

74. The second step is for an applicant to submit a Concept Plan. The purpose of the Concept Plan is to merely "provide a ***general outline*** of the scope, character, and nature of the proposed development that is consistent with the policy direction of . . . policy and regulatory documents, and the review criteria, and to consider the proposal within the context of existing and

---

[1] The public letter can be read here: https://www.dispatch.com/story/news/local/dublin-villager/2014/12/16/resignations-result-council-move-to/23037487007/.

planned development within the vicinity of the project." A Concept Plan is subject to six, enumerated review criteria that are codified in BSD Code § 153.066(E)(4)(a)–(f).

75. Concept Plans are subject to a recommendation from the City's Planning Department and a final decision by the PZC. However, if a Concept Plan has an associated development agreement with the City, which nearly all development requires in the District, it is subject to a recommendation from the Planning Department, review and feedback from the PZC, and a final decision by Council. This new process is what caused a majority of PZC members to resign in 2014. As a concerned Chairperson Groomes stated at the time of her resignation, it was a "denigration of the (former) process."

76. Third, the applicant submits a Preliminary Development Plan. The purpose of the Preliminary Development Plan "is to establish a framework for the proposed development that is consistent with the requirements of . . . adopted plans, policies, and regulations, and the review criteria." A Preliminary Development Plan is subject to fifteen, enumerated review criteria that are codified in BSD Code § 153.066(F)(4)(a)–(o). Preliminary Development Plans are subject to a recommendation from the City's Planning Department and a final decision by the PZC.

77. Fourth, the BSD Code requires an applicant to submit a Final Development Plan. The purpose of the Final Development Plan "is to confirm compliance with the PDP, all requirements of the . . . adopted plans, policies, and regulations, and the review criteria." A Final Development Plan is subject to sixteen, enumerated review criteria that are codified in BSD Code § 153.066(G)(4)(a)–(p). Final Development Plans are subject to a recommendation from the City's Planning Department and a final decision by the PZC.

### H. The City Approves Three Residential Developments Near the DVC.

78. The City has approved numerous residential developments in the BSD District for select property owners and developers.

79.     For example, in 2014, a developer submitted an application to the City for approval of the Tuller Flats development, a residential development adjacent to the DVC. Tuller Flats spans nearly 17 acres and includes more than 400 apartments and townhomes. The City approved Tuller Flats and agreed to pay for public infrastructure internal to and serving Tuller Flats.

80.     In 2020, two developers applied for approval of the Towns on the Parkway, another residential development adjacent to the DVC. The Towns on the Parkway includes 154 for-sale townhomes. The City approved the Towns on the Parkway.

81.     One of the developers also submitted an application for another residential development for 6801 Village Parkway, which is adjacent to the DVC. The development includes three residential buildings consisting of approximately 175 multi-family units. The City approved the 6801 Village Parkway plan with necessary waivers. The waivers were similar to those requested by Stavroff for Application #2.

**I.      Despite the City's Approval of Select Residential Developments, an Independent Third Party Determines That the City Needs Additional Housing.**

82.     Thereafter, the City engaged an independent consultant, Urban Partners, to conduct a study of the City's current housing market and forecasted housing needs. Urban Partners released its study in September 2022.

83.     Urban Partners concluded that the City was in desperate need of additional housing. Urban Partners determined that the City will need an additional 1,200 housing units between 2020 and 2025; 1,040 more between 2025 and 2030; and an additional 2,610 between 2030 and 2040.

84.     In sum, Urban Partners estimated that an additional 4,850 housing units would be required over the twenty-year period. Urban Planners concluded that at least 1,000 of those housing units should be rental housing.

85.     Absent the City's unlawful interference, Stavroff is ready, willing, and able to

redevelop the DVC into residential rental housing to satisfy the City's unmet demand.

**J.      Stavroff Applies to Redevelop Vacant Excess Parking Lots to Two Apartment Buildings.**

86.      Following the City's approval of the residential developments near the Property, Stavroff determined that a mixed-use building, largely consisting of residential housing on a portion of the DVC would complement the other approved residential developments, fulfill a market need, and be an ideal use of the Property's underutilized asphalt parking lots.

87.      Anticipating that Staff would want to be involved in the process, Stavroff worked with Staff in an Informal Review Hearing heard by the PZC on May 5, 2022.  The PZC requested that when Stavroff submitted a revised plan, ultimately its Application #2, that it provide more details on how the development would be walkable, alter the orientation of the buildings, provide open space in a more meaningful way, and address parking concerns.  At the Informal Review, the PZC encouraged Stavroff to follow the BSD Code in crafting its application in certain respects.  In other respects, the PZC actually encouraged Stavroff to deviate from the BSD Code.  As the City knew and understood, certain deviations from the BSD Code were required due to the Property's existing conditions, including an easement for AEP's major transmission line that serves and benefits the community.

88.      Under Staff's guidance and taking into consideration the PZC's previous input at Informal Review, Stavroff thereafter submitted Application #2 for a Concept Plan on November 23, 2022, for the redevelopment of about 3.85 acres of DVC to redevelop a 600 space surface parking lot into 20,000 square feet of commercial space and 350-multi-family homes.  Application #2 complied with certain aspects of the BSD Code and deviated from the BSD Code in certain respects, as requested by PZC.



89.     A hearing on the initial Concept Plan was held by the Planning Commission on December 8, 2022.

90.     Despite working under Staff's guidance for months to develop the Concept Plan, Staff recommended a denial of the application, citing many items that were never addressed with Stavroff during the process.

91.     Similarly, due to contrived concerns, the PZC denied the Concept Plan. The PZC expressed a desire to see a master plan for the redevelopment of the entire DVC, which is not required by the BSD Code. It also expressed concerns over the block length and open space, as well as new issues including incompatible neighboring uses and parking. Even though the BSD Code purportedly allowed flexibility to address existing conditions, the PZC chose to ignore the DVC's existing conditions that prevented perfect compliance with the BSD Code, including, for example, the AEP easement.

**K.      Another Independent Third Party Affirms the City's Need for Additional Housing and Concludes That the "Immediate" Redevelopment of the DVC Property Is "Essential."**

92.     The City retained another consultant, TEConomy Partners, LLC, to create a plan titled "A Strategic Plan to Ensure Long-Term Economic Prosperity in Dublin: Navigating in Today's Constantly Evolving Headwinds." The plan was published in May 2023.

93.     The plan highlighted reoccurring issues with the City's unlawful zoning processes. One of the strategy recommendations with highest priority included: "make Dublin's development process more transparent and predictable thereby reducing uncertainty."

94.     The plan stated also that "[i]t is critical that the City of Dublin continue to build on the momentum of Bridge Park by fully developing the Bridge Street District." One such highlighted "opportunity" was to "redevelop the Dublin Village site to allow for additional mixed-use development."

**L.     Stavroff Submits Application #3, Which Is Fully Compliant with the BSD Code and in Line with Recently Approved Residential Developments.**

95.     Working in good faith, Stavroff redesigned its Concept Plan to fully comply with the BSD Code and address comments received from its initial application.

96.     Stavroff submitted Application #3 for the redevelopment of a portion of the DVC on April 6, 2023.

97.     Application #3 covered an approximately six-acre portion of the DVC located southeast of Village Parkway and Tuller Road, generally, in the same area of the DVC as the previous submission:



98.     Application #3 included two four-story apartment buildings, providing

approximately 280 multifamily units.

99.     To avoid the necessity for waivers and taking into consideration certain existing conditions, Application #3 was intentionally designed to avoid conflict and to complement the recently-approved Concept Plan for another development as well as other neighboring properties recently developed (or approved to be developed) in the area under the BSD. Further, Application #3 complied with the BSD Code's requirements to a painstaking degree.

100.    For example, Application #3 remedied the PZC's purported concerns with the prior proposal regarding circulation, parking, building heights, massing and pedestrian pathways. Each and every concern was meticulously addressed. Stavroff went above and beyond the BSD Code's requirements. Although not required by the BSD Code, at the request of the PZC, Stavroff included a conceptual master plan for the future redevelopment of the *entire* DVC in Application #3. Accordingly, Stavroff provided the City with knowledge of how Application #3's residential development would fit with the rest of the DVC's anticipated redevelopment. A copy of the 2023 DVC Master Plan is attached as **Exhibit 2**.

101.    After spending hundreds of thousands of dollars, Stavroff's application fully complied with the complex BSD Code.

    **M.     The City Adopts the Vague Interim Land Use Principles and then Misapplies the Principles to Once Again Block Stavroff's Development.**

102.    After Stavroff submitted Application #3, the City manufactured an illegitimate basis to deny Stavroff's Application.

103.    On June 12, 2023, Council enacted Resolution 51-23, which adopted the "Interim Land Use Principles."

104.    The Interim Land Use Principles include vague standards such as requiring all development in the BSD to "Be Distinctly Dublin."

105. The Interim Land Use Principles are so vague that they have no meaning. Private property owners cannot ascertain what restrictions might apply to the property they own in order to make reasonable plans for the legitimate use of their private property.

106. On July 20, 2023, the PZC held a hearing on Application #3.

107. Staff was pleased with Application #3 and concluded that the BSD Code's criteria for a Concept Plan were met. Staff additionally found that Application #3 did not require any waivers to be in conformance with the BSD Code. Accordingly, the City's professional Staff recommended approval of Application #3 with conditions that could be addressed at the preliminary development plan stage.

108. The PZC, however, failed to apply the BSD Code applicable to Application #3 but rather arbitrarily and retroactively misapplied the vague Interim Land Use Principles to the Application. Some even applied new standards that were above and beyond the already overly restrictive existing BSD Code.

109. For example, the PZC required Stavroff to comply with all open space requirements, which the BSD Code does not require for a Concept Plan but instead specifically requires at the next stage in the development process.

110. In addition, Commissioner Fishman attempted to restrict Stavroff's use of its Property to less than what is plainly allowed in the BSD Code. He stated that he was voting against Application #3 because he preferred to see two parking spots per residential unit, or 586 parking spots, when the BSD Code only required 337. The PZC's own counsel even stated on the record that Application #3 met the BSD Code's requirements for parking and that parking is not a valid consideration for Concept Plan review.

111. Commissioner Fishman also took offense at the proposed density despite the City's

Director of Planning informing him that there are no density requirements in the BSD Code.

112.    Moreover, the PZC improperly applied the Interim Land Use Principles to Application #3.

113.    The Interim Land Use Principles were not in effect when Stavroff filed Application #3.

114.    Instead, the City enacted and then retroactively misapplied the Interim Land Use Principles to deny Stavroff's Application. Most offensive was the statement that Application #3 failed to meet the utterly vague "Distinctly Dublin" standard.

115.    Despite modeling Application #3 off of the BSD Code and off of the recently approved similarly situated residential plans and consulting Staff throughout the development process, the City instead arbitrarily and unreasonably denied Application #3. Unlike other recently approved plans, Application #3 required no waivers.

116.    The City has improperly singled out and targeted Stavroff to block the development of its Property without any legitimate reason to do so.

117.    As a result of the City's actions, Stavroff has incurred and continues to incur significant damages.

**V.    CLAIMS FOR RELIEF**

**COUNT I – Violation of Equal Protection**
**Under 42 U.S.C. Section 1983 and the Ohio Constitution**

118.    Stavroff incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

119.    The City subjected Stavroff to unequal treatment of the law under color of law in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution.

120. Previously, the City has approved development applications that select developers sought to develop under the BSD Code.

121. Additionally, the City has established a specific process for land use applications for all other similarly situated developers and property owners.

122. The City approved the applications submitted by other developers for similarly situated developments of property adjacent to the DVC.

123. Nevertheless, the City has blocked every development proposed by Stavroff. It has become clear that the City will not approve any application submitted by Stavroff. The City has therefore treated Stavroff differently from the other similarly situated applicants.

124. For example, Application #3 is compliant with all legitimate zoning standards set by the City. The City treated Stavroff differently than the other similarly situated applicants and denied Application #3. The City had no rational basis to deny Application #3, given that it complied with the legitimate criteria.

125. With respect to each and every development proposed by Stavroff, the City acted with animus towards Stavroff and its development and has no rational basis for the discriminatory treatment of Stavroff.

126. As a result, Stavroff has suffered and will continue to suffer from the City's unequal treatment of law.

<u>**COUNT II – Violation of Due Process – Void for Vagueness**</u>
<u>**Under 42 U.S.C. Section 1983 and the Ohio Constitution**</u>

127. Stavroff incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

128. The City has deprived Stavroff of its property and liberty interests under color of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

129. Stavroff's property and liberty interests are of a type protected by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution.

130. Stavroff possesses legitimate claims of entitlement and justifiable expectations in its property interests, including developing its Property in accordance with the applications.

131. The City's BSD Code, on its face and as applied to Stavroff and its Property, is written in a manner that permits and encourages arbitrary, capricious, and discriminatory enforcement.

132. The City's Interim Land Use Principles, on their face and as applied to Stavroff and its Property, are written in a manner that permits and encourages arbitrary, capricious, and discriminatory enforcement.

133. The City's enforcement and threatened continued enforcement of the unconstitutionally vague BSD Code and Interim Land Use Principles on the Property has and will continue to cause the deprivation of Stavroff's property and liberty interests protected under the United States Constitution and the Ohio Constitution.

## COUNT III – Violation of Procedural Due Process
## Under 42 U.S.C. Section 1983 and the Ohio Constitution

134. Stavroff incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

135. The City has deprived Stavroff of its property and liberty interests under color of law without due process of law in violation of the Due Process Clause of the Fourteenth

Amendment to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

136. Stavroff's property and liberty interests are of a type protected by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution.

137. Stavroff possesses legitimate claims of entitlement and justifiable expectations in its property interests, including developing its Property in accordance with the applications.

138. The City deprived Stavroff of its vested rights without due process of law.

139. For example, Application #3 fully complied with the BSD Code. As such, the City had no discretion to deny Application #3 because it complied with the BSD Code and all other legitimate land use restrictions applicable to the Property.

140. Instead of using the BSD Code requirements as they existed when Stavroff submitted Application #3 in April 2023, the City subjected the Application to the Interim Land Use Principles' criteria, which were adopted in July 2023, and the arbitrary personal wishes and desires of individual Commissioners.

141. Stavroff has the right to develop its Property free from arbitrary restrictions imposed by biased officials.

142. Additionally, Stavroff possesses a liberty interest to engage in "whatever legal business [it] elects to pursue," including the design and construction of apartments, free from the City's interference based solely on the fact that its municipal officials simply do not desire more apartments and other affordable housing options. *See Sanderson v. Village of Greenhills*, 726 F.2d 284, 286–87 (6th Cir. 1984).

143. The City denied Stavroff due process by prohibiting Stavroff from engaging in the City's land use application process afforded to other landowners in the City.

144. The City's actions and omissions have prevented Stavroff from putting its Property to economic use and foreclosed Stavroff from engaging in its lawful profession within the City.

145. The City deprived Stavroff of its property and liberty interests by denying Stavroff the opportunity to have its applications reviewed and evaluated by an unbiased decisionmaker.

146. Stavroff has never had a meaningful opportunity to be heard in violation of its rights of procedural due process, as the City changed the rules after Application #3 was submitted.

147. As a result, Stavroff has suffered and will continue to suffer the deprivation of its vested rights under the United States Constitution and the Ohio Constitution.

**COUNT IV – Violation of Substantive Due Process
Under 42 U.S.C. Section 1983 and the Ohio Constitution**

148. Stavroff incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

149. The City has deprived Stavroff of its property and liberty interests under color of law without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

150. Stavroff's property and liberty interests are of a type protected by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution.

151. Stavroff possesses legitimate claims of entitlement and justifiable expectations in its property interests, including developing its Property in accordance with its applications.

152. The City arbitrarily and capriciously deprived Stavroff of its vested rights.

153. For example, the City applied the wrong standards to Application #3, including the Preliminary Development Plan Standards, the Interim Land Use Principles, and even new standards created by the Commissioners.

154.    Stavroff has the right to develop its Property free from arbitrary restrictions imposed by biased officials.

155.    Additionally, Stavroff possesses a liberty interest to engage in "whatever legal business [it] elects to pursue," including the design and construction of apartments, free from the City's interference based solely on the fact that its municipal officials simply do not desire apartments and other affordable housing options. *See Sanderson v. Village of Greenhills*, 726 F.2d 284, 286–87 (6th Cir. 1984).

156.    The City has arbitrarily interfered with and prevented Stavroff from using its Property and foreclosed Stavroff from engaging in its lawful profession within the City.

157.    The City's actions are arbitrary, capricious and unreasonable.

158.    As a result of the City's arbitrary and capricious actions, Stavroff has suffered and will continue to suffer the deprivation of its vested rights under the United States Constitution and the Ohio Constitution.

## COUNT V – Declaratory Judgment

159.    Stavroff incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

160.    The BSD Code and Interim Land Use Principles as applied to the Property are unconstitutional, unreasonable, and not substantially related to the public health, safety, or welfare.

161.    Accordingly, Stavroff is entitled to a declaration that the BSD Code and Interim Land Use Principles as applied to the Property are unconstitutional, unreasonable, and not substantially related to the public health, safety, or welfare.

162.    Stavroff's use of the Property in accordance with Application #3 is constitutional, reasonable, substantially related to the public health, safety, welfare.

163.     Accordingly, Stavroff is entitled to a declaration that use of the Property in accordance with Application #3 is constitutional, reasonable, substantially related to the public health, safety, welfare.

## VI. PRAYER FOR RELIEF

WHEREFORE, in consideration of the foregoing, Stavroff seeks:

A)  Compensatory damages in an amount to be determined by a jury;

B)  A declaration that the BSD Code and Interim Land Use Principles are unconstitutional, unreasonable, and/or not substantially related to the public health, safety, or welfare;

C)  A declaration that Stavroff's use of the Property in accordance with Application #3 is constitutional, reasonable, and substantially related to the public health, safety, or welfare;

D)  An injunction requiring the City to refrain from any action to prevent Stavroff from developing the Property consistent with Application #3;

E)  Pre- and post-judgment interest;

F)  Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

G)  Any other declarative, injunctive, or other equitable relief this Court deems just and appropriate.

Respectfully submitted,

VORYS, SATER, SEYMOUR AND PEASE LLP

*/s/ Joseph R. Miller*
Joseph R. Miller (0068463), *Trial Attorney*
Christopher L. Ingram (0086325)
Elizabeth S. Alexander (0096401)
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6233
Fax: (614) 719-4630
jrmiller@vorys.com
clingram@vorys.com
esalexander@vorys.com

*Counsel for Plaintiffs Stavroff Land & Development, Inc., DVC 10 Associates, LLC, DVC 6525 Associates, LLC, DVC 6561-6815 Associates, LLC, and DVC 6700 Associates, LLC*

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs Stavroff Land & Development, Inc., DVC 10 Associates, LLC, DVC 6525 Associates, LLC, DVC 6561-6815 Associates, LLC, and DVC 6700 Associates, LLC demand a trial by jury on all issues so triable.


*/s/ Joseph R. Miller*
Joseph R. Miller